**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
Greenbelt Division**

| | | |
|---|---|---|
| **In re:** | * | |
| | * | |
| **PARKING MANAGEMENT, INC.** | * | **Case No. 20-15026-TJC** |
| | * | **Chapter 11 (Subchapter V)** |
| **Debtor.** | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## DEBTOR'S CHAPTER 11 SUBCHAPTER V PLAN
### Dated August 5, 2020

Parking Management, Inc., the above-captioned debtor and debtor-in-possession (the "Debtor"), proposes the following Plan under § 1190 and § 1191 of Title 11 of the United States Code (the "Bankruptcy Code"). A brief history of the Debtor's business operations is attached hereto as **Appendix A**.

All creditors and equity security holders should refer to Articles III through VII of this Plan for information regarding the precise treatment of their claims or interests. **Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.) This Plan is a proposal by the Debtor and subject to court approval after opportunity for objections and a hearing. Please refer to Scheduling Order __ [Dkt. __] for important information regarding Plan voting and objection deadlines.**

### Article I.  Source of Payments

During the term of this Plan, the Debtor shall submit the disposable income (or value of such disposable income) necessary for the performance of this plan to the Subchapter V Trustee (the "Trustee") and shall pay the Trustee or her designee the sums set forth herein. Specifically, all of the Debtor's net operating income (includes (1) gross cash operating revenues, less (2) all expenses and the funding of capital expense and operating reserves ("NOI") for 36 months shall be delivered to the Trustee or her designee for distribution to creditors.

### Article II.  Plan Term

The term of this Plan begins on the date of entry of a final order confirming this Plan or such other date as the Court may determine in the Plan confirmation order to be the Plan's effective date and ends on the 36th month subsequent to that date.

### Article III.  General Distributions under Plan

The value of the property to be distributed under the Plan during the term of the Plan is not less than the Debtor's projected NOI for that same period. Unsecured creditors holding allowed claims will receive distributions, which the Debtor has estimated at approximately 31 cents on

the dollar.[1] The Plan also provides for the payment of administrative and priority claims in accordance with the Bankruptcy Code.

### Article IV.  Classification and Treatment of Claims and Interests

1. The Debtor has classified all claims and interests in accordance with §§ 1122, 1123, and 1190 of the Bankruptcy Code.  A chart detailing each class of claims or interests under the Plan, and the Debtor's proposed treatment for each is attached hereto as **Appendix B**.

2. All parties claiming administrative expense priority (including unsecured claims) pursuant to § 507(a)(2) of the Bankruptcy Code but not already treated as such under this plan, shall file an application to approve their respective asserted administrative claim priority status no later than fifteen (15) days after the Effective Date.  Any claim that is granted administrative expense priority shall receive the treatment set forth in **Appendix B**.

3. Disputed Claims:

    a. A disputed claim is a claim that has not been allowed or disallowed by a final non-appealable order and, either:

        i. A proof of claim has been filed or deemed filed, and the Debtor has filed an objection; or

        ii. No proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent or unliquidated so that such claim is disallowed.

    b. Delay of Distribution on a Disputed Claim:  No distribution will be made on a disputed claim unless the claim is resolved consensually or is allowed by a final non-appealable order.  Except to the extent the Court orders otherwise, a reserve shall be established from any distribution to creditors sufficient to pay the pro rata share of any distribution that would be allocated to any holder of a disputed claim on account of such disputed claim in the event that such disputed claim were allowed.  At the time such disputed claim is allowed by entry of a final order, the holder thereof shall receive the amount of any reserve to which it is entitled based upon the allowed amount of its claim.  To the extent a disputed claim is disallowed, the amount reserved on account of such claim shall be redistribute pro rata on account of allowed claims in the same class as the disputed claim, provided, however, that no holder of an allowed claim shall receive a distribution that exceeds 100% of the allowed amount of such holder's claim.

    c. Settlement of Disputed Claims:  The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Federal Rule of Bankruptcy Procedure 9019.

---

[1] In the event that the PPP loan is forgiven, in part or in whole, there may be more funds to distribute to unsecured creditors.

## Article V.  Payments to Creditors under Plan

Unless otherwise provided in this Plan or indicated on **Appendix B**, funds received by the Trustee or her designee or otherwise included in this Plan shall be used to pay the following claims in the priority indicated:

1.  Except as provided in § 1191(e) of the Bankruptcy Code, all claims entitled to priority under § 507 of the Bankruptcy Code shall be paid in accordance with § 1129(a)(9) of the Bankruptcy Code and as set forth on **Appendix B**.

2.  Pursuant to § 1191(e) of the Bankruptcy Code, the payment of claims entitled to priority under § 507(a)(2) and § 507(a)(3) of the Bankruptcy Code shall be paid under the Plan as set forth on **Appendix B**.

3.  After payment of the foregoing claims, sums received by the Trustee or her designee shall be paid, on a pro-rata basis, to holders of allowed general unsecured claims on account  of such allowed claims

4.  In accordance with § 1191 of the Bankruptcy Code and the terms of this Plan, the Debtor's equity security holders shall retain their interests in the Debtor.

## Article VI.  Trustee Compensation

The Trustee shall be paid for services rendered in this Chapter 11 case as an administrative claim under § 507 of the Bankruptcy Code and pursuant to Article IV of this Plan, as set forth on **Appendix B**.  All fees and expenses requested by the Trustee are subject to review and approval by the Court under §§ 329 and 330 of the Bankruptcy Code.

## Article VII.  Debtor's Professionals' Compensation

The Debtor's attorney, Michael J. Lichtenstein, Esquire, Shulman, Rogers, Gandal, Pordy & Ecker, P.A. and the Debtor's financial advisor JW Infinity Consulting, LLC and Jolene Wee shall be paid for the services rendered to the Debtor herein as an administrative claim under § 507 of the Bankruptcy Code and pursuant to Article IV of this Plan, as set forth on **Appendix B**.  All fees and expenses requested by the Debtor's attorney, including those on **Appendix B**, are subject to review and approval by the Court under §§ 329 and 330 of the Bankruptcy Code.

## Article VIII.  Liquidation Analysis

Attached hereto as **Appendix C** is the Liquidation Analysis required by § 1190(1)(B) of the Bankruptcy Code and the Local Rules of this Court.

## Article IX.  Debtor's Disposable Income and Plan Funding

An exhibit describing (i) the Debtor's projected NOI as defined by § 1191(d) of the Bankruptcy Code, (ii) the details supporting and the assumptions under which said projections were made,

(iii) the source and value of funds and assets available for distribution under the Plan, and (iv) a summary of payments under this Plan is attached as **Appendix D**.

## Article X.  Executory Contracts and Unexpired Leases

12.01 <u>Assumption</u>.  Pursuant to § 365 of the Bankruptcy Code, the Debtor assumes each executory contract and unexpired lease listed on **Appendix E**, effective upon the Effective Date. To the extent the Debtor proposes to make cure payments as may be required under § 365(b), those cure payments shall be made as set forth on **Appendix E**.

12.02. <u>Rejection</u>.  The Debtor will be conclusively deemed to have rejected all executory contracts and unexpired leases not (i) expressly listed on **Appendix F** and assumed under this Plan or (ii) previously assumed, and if applicable assigned, before the Effective Date; or (iii) that are the subject of a pending motion to assume (and if applicable, assign).  A proof of claim arising from the rejection of an executory contract or an unexpired lease under the Plan must be filed with the Court and served on the Trustee and the Debtor no later than 30 days after the Effective Date.

## Article XI.  Property Vests in Debtor Free and Clear

Except as provided in this Plan or the Order confirming this Plan, all of the property of the estate, pursuant to §§ 1141(b) and 1141(c) of the Bankruptcy Code, vests in the Debtor as of the Effective Date free and clear of any claim or interest of any creditor provided for by this Plan.

## Article XII.  Confirmed Plan Binding on Debtor and Creditors

Except as provided in §§ 1141 or 1192 of the Bankruptcy Code, as applicable, the provisions of this Plan shall, upon confirmation, bind the Debtor, each and every creditor of this estate and each party in interest, whether or not the claim of such creditor or party is provided for by the Plan and whether or not such creditor or party has accepted or has rejected the Plan.

## Article XIII.  Discharge

**On the confirmation date of this Plan, and subject to the occurrence of the Effective Date, the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in § 1141(d)(1)(A) of the Bankruptcy Code, but the Debtor will not be discharged of any debt: (i) imposed by this Plan; (ii) of a kind specified in § 1141(d)(6)(A) if a timely complaint was filed in accordance with Federal Rule of Bankruptcy Procedure 4007(c) of the; or (iii) of a kind specified in § 1141(d)(6)(B).**

## Article XIV.  Miscellaneous

16.01 <u>Definitions and Rules of Construction</u>.  The definitions and rules of construction set forth in § 101 and § 102 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan.

16.02 <u>Effective Date of Plan</u>.  The effective date of this Plan is the first business day following the date that is fourteen days after the entry of the order of confirmation.  If, however, a stay

of the confirmation order is in effect on that date, the effective date will be the first business day after the date on which the stay of the confirmation order expires or is otherwise terminated.

16.03 <u>Severability</u>.  If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provisions of this Plan.

16.04 <u>Binding Effect</u>.  The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of, the successors or assigns of such entity.

16.05 <u>Appendices</u>.  The Appendices attached to the Plan are incorporated into the Plan by reference as if the same were fully rewritten herein.

16.06 <u>Captions</u>.  The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

16.07 <u>Controlling Effect</u>.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of Maryland govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

16.08 <u>Corporate Governance</u>.  Section 1123(a)(6) of the Bankruptcy Code is inapplicable as there is not more than one class of voting equity securities.

### Article XV.  Plan Proposed in Good Faith

The Debtor represents that it is within Debtor's ability to carry out this Plan, and the Plan is submitted in good faith.

### Article XVI.  Retention of Jurisdiction

The Court shall retain jurisdiction of this Chapter 11 case to issue orders necessary to the consummation of the Plan; to determine the allowance of compensation and expenses of professionals; to determine any and all adversary proceedings, applications and contested matters; to determine issues or disputes relating to the assumption of executory contracts and any claims related thereto; to determine disputes as to classification or allowance of claims or interests; to issue such orders in aid of execution of this Plan to the extent authorized by § 1142 of the Bankruptcy Code; to enforce the provisions of the Plan; to recover all assets of the Debtor and property of the Debtor's estate, wherever located; to resolve any dispute between or among any of the parties to this bankruptcy proceeding, to determine other such matters as may be set forth in a confirmation order or as may be authorized under the provisions of the Bankruptcy Code; to enter a final decree closing the bankruptcy case; and to correct any defect, cure any omission or reconcile any inconsistency in this Plan or confirmation order, and to take any action or make any ruling as may be necessary to carry out the purpose and intent of this Plan.

Dated: August 7, 2020 **PARKING MANAGEMENT, INC.**

By:    /s/ Kingdon Gould, III
Kingdon Gould, III
President

Counsel for Debtor:

/s/ Michael J. Lichtenstein
Michael J. Lichtenstein (Bar No. 05604)
Shulman, Rogers, Gandal, Pordy & Ecker, P.A.
12505 Park Potomac Avenue, Sixth Floor
Potomac, Maryland 20854
TEL:   (301) 230-5231
FAX:   (301) 230-2891
Email: mjl@shulmanrogers.com
*Attorneys for Debtor*

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of August, 2020, notice of filing the **Debtor's Chapter 11, Subchapter V Plan**, was served by CM/ECF to those parties listed on the docket as being entitled to such electronic notices, which parties are identified below:

Monique D. Almy malmy@crowell.com, cbest@crowell.com, malmy@ecf.axosfs.com

Gwynne L. Booth GLB@GDLLAW.COM

Richard L. Costella rcostella@tydings.com, jmurphy@tydings.com

Mary S. Diemer mary.diemer@nelsonmullins.com, robert.ours@nelsonmullins.com

Philip Tucker Evans philip.evans@hklaw.com, kimi.odonnell@hklaw.com

Rosa Evergreen rosa.evergreen@arnoldporter.com, ecf-a6608983ebb8@ecf.pacerpro.com

John David Folds dfolds@bakerdonelson.com, sparson@bakerdonelson.com

Catherine Harrington charrington@bregmanlaw.com

David D. Hudgins e-mailbox@hudginslawfirm.com

Walter R. Kirkman wkirkman@bakerdonelson.com, cgregory@bakerdonelson.com

Lynn A. Kohen lynn.a.kohen@usdoj.gov

Leonidas Koutsouftikis lkouts@magruderpc.com, mcook@magruderpc.com

Richard M. Kremen richard.kremen@dlapiper.com, bill.countryman@dlapiper.com

Alexander M. Laughlin alex.laughlin@ofplaw.com, marse.hammond@ofplaw.com

Richard Edwin Lear richard.lear@hklaw.com, kimi.odonnell@hklaw.com

Stephen W. Nichols snichols@offitkurman.com

Robert B. Scarlett RScarlett@ScarlettCroll.com, krynarzewski@scarlettcroll.com, mmyers@scarlettcroll.com, scarlettrr64434@notify.bestcase.com

Bryn Hope Sherman bsherman@offitkurman.com, rparrish@offitkurman.com

David Sommer dsommer@gejlaw.com, ceyler@gejlaw.com,
gomara@gejlaw.com

Jackson David Toof jackson.toof@arentfox.com

US Trustee - Greenbelt USTPRegion04.GB.ECF@USDOJ.GOV

Jolene E. Wee jwee@jw-infinity.com

And via electronic mail, to:

Lauren Douglas        LDouglas@hoffmantowncenter.com

 /s/ Michael J. Lichtenstein
Michael J. Lichtenstein

**Appendix A**
(Debtor's Business History)

A.    Nature and History of the Debtor's Business or Commercial Activities:

PMI is one of the largest and most respected parking operators in the Mid-Atlantic region.  Founded in 1947 by Kingdon Gould, Jr., and D.F. Antonelli, Jr., PMI is a private corporation incorporated in the State of Maryland, and is headquartered at 1725 DeSales Street, NW, Washington, D.C. 20036.

As of April 30, 2020, PMI leased or managed approximately 100 parking facilities throughout the Northern Virginia, Washington, D.C. and Baltimore, MD metropolitan areas and employed 191 employees.  The Debtor has experience in leasing and managing all levels of commercial and residential parking operations.  The Debtor employs two basic structures for its parking operations.  Under the first structure, the Debtor leases a parking lot from a property owner, operates the parking facility, and pays rent to the owner.  Under the second structure, the Debtor manages a parking facility for the property owner pursuant to a management agreement and receives a management fee as compensation for doing so.  Of the 100 parking facilities operated by PMI prior to the Petition Date, 42 were operated pursuant to leases and 58 were operated pursuant to management agreements.

B.    Ownership Structure of the Debtor's Business or Commercial Activities:

PMI is 100 percent owned by the Gould family.  The largest shareholder is the Estate of Kingdon Gould, Jr.  The Debtor has no secured funded debt obligations.  The Debtor's liabilities, as of the Petition Date, were approximately $7.2 million (excluding debts and obligations owed to insiders and affiliates of the Debtor).  This includes liabilities arising under various parking lot leases and parking lot management agreements, prepetition employee wages for the current wage period (for which the Debtor received authority to pay pursuant to a wage motion), and certain trade credit obligations.

C.    Description of the Performance of the Debtor's Business or
Commercial Activities in the Three Years Before the Bankruptcy
<u>Filing and the Events Leading to the Debtor's Bankruptcy Filing</u>:

In Fiscal Year 2018 and Fiscal Year 2019, the Debtor reported consolidated net revenue of $87,323,000 and $86,056,100, respectively.  Revenue fell $1.3 million from Fiscal Year 2018 to Fiscal Year 2019, or -1%.  The Debtor experienced a loss from operations in the amount of $1,113,300 in Fiscal Year 2018, and approximately $1,902,000 in Fiscal Year 2019. While driving continues to be the preferred method of transportation for many D.C. commuters, the demand for parking has been affected by the increased use of mass transit,[2] ride-sharing services (such as Uber and Lyft), and telecommuting.[3]  In addition, the Debtor's number of locations has declined since Fiscal Year 2015.

1.    <u>Onset and Impact of COVID-19</u>

Like so many other small businesses in the area and throughout the country, the Debtor's revenues declined dramatically as a result of COVID-19 and the actions taken in response to it by government entities and private businesses.  In March 2020, non-essential businesses were ordered to shut down and shelter-in-place orders were issued for Washington D.C., Maryland and Virginia.  Many people in the area were laid off from their jobs.  Those who still had jobs were, with very limited exceptions, working remotely.  These people have little or no need for parking lots.  As a result, revenues dropped precipitously across the Debtor's portfolio of parking lots, impairing its ability to pay its operating expenses, including rent owed under its parking lot leases.

---

[2]    *See* DePuyt, Bruce. "Survey Shows Fewer D.C.-Area Commuters Are Driving Solo." *Maryland Matters*, 18 Sept. 2019, www.marylandmatters.org/2019/09/18/survey-shows-fewer-d-c-area-commuters-are-driving-solo/.

[3]    In a Washington Post poll, "[m]ost residents, 61 percent, say they used Uber, Lyft or a similar service in the past year. Six years ago, when the services were just becoming popular, 13 percent of residents said they had ever used a ride service."  https://www.washingtonpost.com/local/trafficandcommuting/the-car-is-still-king-in-the-washington-region-post-shar-school-poll-finds/2019/06/06/106ce1b4-86df-11e9-a491-25df61c78dc4_story.html.

The Debtor's management took proactive measures to address the situation. First, it undertook a thorough analysis of its business operations, in an effort to determine whether the business could remain viable, and what sort of restructuring would be necessary in order for that to occur. Second, it engaged legal counsel to help it evaluate its restructuring options. Third, it endeavored to manage cash carefully, so as to put the Debtor in the best possible position to ride out the storm. Fourth, on or about April 5, 2020, the Debtor submitted an application (the "PPP Loan Application") with Truist Bank[4] for financing under the Paycheck Protection Program (the "PPP"), which was implemented as part of the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"). On April 30, 2020, the PPP Loan Application was approved, and on May 1, 2020, the loan was funded in the amount of approximately $1,800,000, providing the Debtor with a much needed liquidity infusion to sustain its operations.

Notwithstanding receipt of the PPP funds, PMI still requires a restructuring, including, without limitation, to adjust its operational footprint, reduce operating costs, focus on profitable locations and business operations, preserve jobs, and thereby attempt to ensure that it will be poised for long term growth following conclusion of the COVID-19 pandemic. To accomplish this, the filing of this Chapter 11 Case was necessary. It provides the Debtor with the only economic and practical solution to achieve the necessary restructuring. The recently enacted Small Business Reorganization Act will enable the Debtor to achieve the necessary restructuring more quickly and efficiently, and at a lower cost, than a traditional Chapter 11 reorganization.

The restructuring began prior to the Petition Date with the closing of twelve of the Debtor's leased locations. The combination of reduced revenue and rent

---

[4]    On December 6, 2019, SunTrust Bank ("SunTrust") merged with Branch Banking and Trust Company ("BB&T") and the combined bank is now known as Truist Bank ("Truist").

obligations (collectively totaling approximately $620,000 per month) resulted in approximately $2.6 million in operating losses for FY 2019 from these locations.  Had these locations been closed at the beginning of Fiscal Year 2019, the Debtor would have earned a profit of approximately $700,000 instead of the reported loss of approximately $1,902,000.

**Appendix B**

(Classification and Treatment of
Claims and Interests)

| Class No. | Description of Claims or Interests in Class | Total Amount of Claims or Interests in Class | Proposed Treatment Under Plan (including whether impaired) | Estimated Percentage Recovery[5] |
|---|---|---|---|---|
| | **Administrative** | | | |
| | Shulman Rogers *Debtor's Counsel* | $300,000 (estimated) | Payment after the Effective Date after Court approval of fees and expenses | 100% |
| | Monique Almy *Subchapter V Trustee* | $80,000 (estimated) | Payment after the Effective Date after Court approval of fees and expenses | 100% |
| | JW Infinity Consulting, LLC/Jolene Wee *Financial Consultant* | $370,000 (estimated) | Payment after the Effective Date after Court approval of fees and expenses | 100% |
| | Unsecured claims | $12,343,934 | Impaired.  Payment of NOI for three years after payment of allowed administrative expenses | 31% |

---

[5] Total claims based upon schedules as amended and proofs of claim.  The Debtor reserves the right to object to claims and to seek recovery of avoidable transfers.

## **Appendix C**
### (Liquidation Analysis)

The liquidation analysis presents two scenarios:  a forced liquidation, under which assets are sold as quickly as possible, and an orderly liquidation, which assumes a reasonable time period for the liquidation of the assets at market prices under normal market conditions.[6]  The assumptions underlying the Liquidation Analysis include:

- The forced liquidation begins on October 1, 2020 and is complete by October 31, 2020.

- The orderly liquidation begins on October 1, 2020 and is complete by December 31, 2020.

- All lots have been closed on September 30, 2020; there are no further revenues or operating expenses.

- Accrued administrative expenses are paid.

- A small number of employees remain to manage the liquidation.

- The price for the sale of the largest asset, a parcel of real estate, was determined by an appraiser.  The projected proceeds were discounted based on various factors, including the appraiser's estimation of twelve to eighteen months to close a fair market sale and the assumed environmental contamination of the property, the extent of which is unknown.

- Neither liquidation scenario contemplates a going concern sale of the Debtor's business operations for reasons including the non-transferability of certain leases and contracts.

The liquidation values in both the forced liquidation scenario and the orderly liquidation scenario provide a lower return to creditors than under the Plan.

---

[6] Definitions per the Association of Insolvency and Restructuring Advisors.

## Liquidation Analysis

| | Projected Liquidation Scenarios | |
|---|---|---|
| | Forced Liquidation (1 month) | Orderly Liquidation (3 months) |
| Projected cash balance - October 1, 2020 | $ 2,600,000 | $ 2,600,000 |
| **Receipts** | | |
| Collection of Accounts Receivable | 45,000 | 45,000 |
| Asset sale proceeds | 2,830,000 | 3,630,000 |
| **Total receipts** | 2,875,000 | 3,675,000 |
| **Accounts Payable (administrative expenses** | | |
| Wages for remaining employees (including tax and fringe) | (75,600) | (226,800) |
| Office Rent and other office expenses | (62,000) | (186,000) |
| Parking tax for previous month | (112,000) | (112,000) |
| Other Post-petition Payables (administrative expenses) | (50,000) | (50,000) |
| **Total Accounts Payable** | (299,600) | (574,800) |
| **NOI and Percentage Rent** | | |
| NOI for September | (750,000) | (750,000) |
| Percentage Rent for September | (77,000) | (77,000) |
| **Total rent and NOI** | (827,000) | (827,000) |
| **Liquidation Costs** | | |
| Employee PTO accrued | (615,000) | (615,000) |
| Disposal costs | (100,000) | (100,000) |
| Chapter 7 Trustee Fees | | |
| Trustee Fees | (100,000) | (125,000) |
| Trustee Professionals and Expenses | (150,000) | (200,000) |
| **Total Liquidation Costs** | (965,000) | (1,040,000) |
| Net cash flow | 783,400 | 1,233,200 |
| **Total available for distribution to creditors** | **$   3,383,400** | **$   3,833,200** |

**Appendix D**
(Projected Disposable Income)[7]

## I.    Projected NOI

| | | FY 2021 | | |
|---|---|---|---|---|
| | | **31-Dec-20** | **31-Mar-21** | **30-Jun-21** | **30-Sep-21** |
| **REVENUE** | | | | | |
| Leased lot revenue | | $ 2,577,765 | $ 2,772,650 | $ 2,989,100 | $ 3,302,520 |
| Managed lot fees | | 192,030 | 192,030 | 192,030 | 192,030 |
| **Total Revenue** | | **$ 2,769,795** | **$ 2,964,680** | **$ 3,181,130** | **$ 3,494,550** |
| **EXPENSES** | | | | | |
| Expenses - Leased Lots | | | | | |
| Rent (including percentage rent) | | 1,833,940 | 1,940,000 | 2,018,830 | 2,142,500 |
| Personnel expense (including tax & fringe) | | 393,750 | 393,750 | 393,750 | 393,750 |
| Other direct and allocated expenses | | 150,000 | 150,000 | 150,000 | 150,000 |
| Total Expenses - Leased Lots | | 2,377,690 | 2,483,750 | 2,562,580 | 2,686,250 |
| Operations Overhead | | 363,110 | 369,110 | 374,750 | 419,110 |
| Selling, General & Administrative Expenses | | 593,755 | 595,735 | 593,755 | 625,735 |
| Total Expenses | | 3,334,555 | 3,448,595 | 3,531,085 | 3,731,095 |
| **PROJECTED NET OPERATING INCOME** | | **$    (564,760)** | **$   (483,915)** | **$   (349,955)** | **$   (236,545)** |
| | Annual savings | | | | |
| Cost reduction programs | | | | | |
| IT / Telecom consolidation | 125,000 | 31,250 | 31,250 | 31,250 | 31,250 |
| 1Q 2021 headcount reduction | 897,970 | 224,490 | 224,490 | 224,490 | 224,490 |
| 3Q 2021 headcount reduction | 213,990 | - | - | 53,500 | 53,500 |
| Office space consolidation | 240,000 | - | - | 60,000 | 60,000 |
| Fringe savings from furloughed staff | 170,060 | 42,515 | 42,515 | 42,515 | 42,515 |
| Net savings (decrease in expenses) | | 298,255 | 298,255 | 411,755 | 411,755 |
| **PROJECTED NET OPERATING INCOME** | | **$   (266,505)** | **$  (185,660)** | **$    61,800** | **$    175,210** |
| **AFTER COST REDUCTION PROGRAMS** | | | | | |

---

[7] To the extent revisions are necessary due to assumption/rejection of management contracts or leases or revenue adjustments, the Debtor reserves the right to file amended projections prior to the confirmation hearing.

**I.    Projected NOI**

**(continued from previous page)**

|  | FY 2022 | | | |
|---|---|---|---|---|
|  | **31-Dec-21** | **31-Mar-22** | **30-Jun-22** | **30-Sep-22** |
| **REVENUE** | | | | |
| Leased lot revenue | $ 3,680,815 | $ 4,080,865 | $ 4,420,100 | $ 4,634,550 |
| Managed lot fees | 192,030 | 192,030 | 192,030 | 192,030 |
| **Total Revenue** | **$ 3,872,845** | **$ 4,272,895** | **$ 4,612,130** | **$ 4,826,580** |
| **EXPENSES** | | | | |
| Expenses - Leased Lots | | | | |
|   Rent (including percentage rent) | 2,205,420 | 2,318,720 | 2,456,780 | 2,596,320 |
|   Personnel expense (including tax & fringe) | 393,750 | 393,750 | 393,750 | 393,750 |
|   Other direct and allocated expenses | 150,000 | 150,000 | 150,000 | 150,000 |
| Total Expenses - Leased Lots | 2,749,170 | 2,862,470 | 3,000,530 | 3,140,070 |
| Operations Overhead | 419,110 | 420,000 | 420,000 | 420,000 |
| Selling, General & Administrative Expenses | 650,735 | 625,000 | 625,000 | 625,000 |
| Total Expenses | 3,819,015 | 3,907,470 | 4,045,530 | 4,185,070 |
| **PROJECTED NET OPERATING INCOME** | **$        53,830** | **$      365,425** | **$      566,600** | **$      641,510** |

| Cost reduction programs | Annual savings | | | | |
|---|---|---|---|---|---|
|   IT / Telecom consolidation | 125,000 | 31,250 | 31,250 | 31,250 | 31,250 |
|   1Q 2021 headcount reduction | 897,970 | 224,490 | 224,490 | 224,490 | 224,490 |
|   3Q 2021 headcount reduction | 213,990 | 53,500 | 53,500 | 53,500 | 53,500 |
|   Office space consolidation | 240,000 | 60,000 | 60,000 | 60,000 | 60,000 |
|   Fringe savings from furloughed staff | 170,060 | 42,515 | 42,515 | 42,515 | 42,515 |
| Net savings (decrease in expenses) | | 411,755 | 411,755 | 411,755 | 411,755 |

| **PROJECTED NET OPERATING INCOME** | **$      465,585** | **$      777,180** | **$      978,355** | **$ 1,053,265** |
|---|---|---|---|---|
| **    AFTER COST REDUCTION PROGRAMS** | | | | |

### I.    Projected NOI

**(continued from previous page)**

|  | | FY 2023 | | | |
|---|---|---|---|---|---|
|  | | **31-Dec-22** | **31-Mar-23** | **30-Jun-23** | **30-Sep-23** |
| **REVENUE** | | | | | |
| Leased lot revenue | | $4,771,550 | $4,811,430 | $4,819,000 | $4,822,835 |
| Managed lot fees | | 192,030 | 192,030 | 192,030 | 192,030 |
| **Total Revenue** | | **$4,963,580** | **$5,003,460** | **$5,011,030** | **$5,014,865** |
| **EXPENSES** | | | | | |
| Expenses - Leased Lots | | | | | |
|   Rent (including percentage rent) | | 2,683,160 | 2,759,980 | 2,763,030 | 2,764,040 |
|   Personnel expense (including tax & fringe) | | 393,750 | 393,750 | 393,750 | 393,750 |
|   Other direct and allocated expenses | | 150,000 | 150,000 | 150,000 | 150,000 |
| Total Expenses - Leased Lots | | 3,226,910 | 3,303,730 | 3,306,780 | 3,307,790 |
| Operations Overhead | | 420,000 | 420,000 | 420,000 | 420,000 |
| Selling, General & Administrative Expenses | | 625,000 | 625,000 | 625,000 | 625,000 |
| Total Expenses | | 4,271,910 | 4,348,730 | 4,351,780 | 4,352,790 |
| **PROJECTED NET OPERATING INCOME** | | **$ 691,670** | **$ 654,730** | **$ 659,250** | **$ 662,075** |
|  | Annual savings | | | | |
| Cost reduction programs | | | | | |
|   IT / Telecom consolidation | 125,000 | 31,250 | 31,250 | 31,250 | 31,250 |
|   1Q 2021 headcount reduction | 897,970 | 224,490 | 224,490 | 224,490 | 224,490 |
|   3Q 2021 headcount reduction | 213,990 | 53,500 | 53,500 | 53,500 | 53,500 |
|   Office space consolidation | 240,000 | 60,000 | 60,000 | 60,000 | 60,000 |
|   Fringe savings from furloughed staff | 170,060 | 42,515 | 42,515 | 42,515 | 42,515 |
| Net savings (decrease in expenses) | | 411,755 | 411,755 | 411,755 | 411,755 |
| **PROJECTED NET OPERATING INCOME** **AFTER COST REDUCTION PROGRAMS** | | **$1,103,425** | **$1,066,485** | **$1,071,005** | **$1,073,830** |

## II.    Assumptions under which the projections were made

For the purposes of projecting the Debtor's NOI as defined by § 1191(d) of the Bankruptcy Code, the Debtor considered the following economic factors:

- The projected COVID-19 timeline, including the possibility of a vaccine available early in 2021;

- Employment, including high unemployment in the Washington DC metro region in the short term due to social distancing measures, projected strong long-term employment and expansion of government employment;

- The effect of various federal stimulus packages;

- The evolution of telecommuting options;

- The availability and use of public transportation;

- Expansion of the federal government;

- High disposal incomes in the region
    - Washington DC has the highest minimum wage
    - Washington DC and Maryland consistently lead the nation with high median household income;

- Amazon HQ2 presence
    - Projected $2.5 billion investment in the Washington DC region.
    - Targeted 25,000 new jobs; hired only 1,000 to date; and

- Transit, workplace, residential trends, retail and recreational trends.

In the short term, even though businesses located near PMI's garages are now allowed to reopen, many office buildings are phasing in their reopening. Certain restrictions such as restaurants being required to operate at 50% of capacity for indoor dining and state mandates involving facial coverings indoors have made it difficult for commercial activities to return back to normal. However, while the world grapples with the uncertainties of COVID-19 now, economic data points to a strong long-term economic outlook for the Washington DC metro region.

In addition to the twelve locations closed around the Petition Date, the Debtor has examined and rejected several other leases. The Debtor has chosen to keep open the locations with the most favorable characteristics, such as profitability, rent terms and/or customer demand. However, when compared to the previous fiscal year, the contraction in the number of locations naturally created a parallel contraction in revenue, which is further reduced by the circumstances of the COVID-19 pandemic. Although removing the losses of the closed locations will improve the net income, the Debtor will have to right size its overhead structure commensurate with its new revenue level.

The Debtor took a conservative approach to the Plan's projections.  Accordingly, the projections assume the following:

1.  Leased Lots:

There are two types of parking revenues – monthly and daily parking fees.

Monthly parkers pay a fixed parking fee ranging from approximately $150 to $350 per month.  These customers are steady as their parking habits relate to their commute to their workplace and their residence. Monthly parking revenues are based on the projected number of monthly customers multiplied by the monthly parking fee for each lot.

Daily parking, however, depends on the timing of the parking as well as the duration. For daily parking, for each lot, the number of parking spots available for daily parking will be the remaining spots not already occupied by monthly parkers.

Each lot is projected separately and are rolled up by month and then by quarter as presented in the Plan.

In each lot's projections, monthly parking revenues are based on the number of monthly spots or contracts sold every month for every lot.  The daily parking revenues, however, are projected based on percentage increases, if any, in daily parking revenues, not to exceed the highest daily parking fees per parking spot achieved in the 18 months prior June 2020 for every lot.

For each lot, the projections assume:

  a.  Immediate term (October 2020 through June 2021) – Minimal increases in parking activities during the period.

  b.  Intermediate term (July 2021 through December 2022) – Rebound in parking activities to return to normalized pre-COVID parking levels, not to exceed the highest daily parking fees per parking spot achieved in the 18 months prior June 2020.

  c.  Long term (January 2023 through September 2023) – Regain maximum monthly highest parking revenues for leased lots.

  Prices are projected to remain relatively flat throughout the projection period.

2.  Managed lots:

  Management fees remain relatively flat throughout the projection period. Revenue and expenses of managed lots are pass-throughs:  PMI collects the revenue and pays the expenses, keeps a management fee, then remits the net operating income to the property owner or agent.

3.  Expenses:

  While some expense line items remain approximately flat throughout the projection period, other major categories are reduced by cost reduction programs.

## III.    Payments under the Plan

## (Projected Payments at Plan Confirmation)

| Estimated payment date | | Projected Plan Effective Date 10/1/2020 |
|---|---|---|
| | | FY 2020 |
| | | **30-Sep-20** |
| Beginning cash balance | | $  2,600,000 |
| Funding of capital expenditures reserves | $        (200,000) | |
| **Projected NOI from Subchapter V Plan** | | |
| Estimated Ch 11 Professional fees | | |
| Debtor's counsel | | (300,000) |
| Debtor's FA | | (370,000) |
| Subchapter V trustee | | (80,000) |
| Appraiser | | (2,900) |
| **Cash available for distribution, net of working capital reserve** | | |
| Projected distributions | **Total** | |
| Cure payments | (4,785,802) | (1,000,000) |
| General unsecured creditors | (12,208,001) | - |
| **Total distribution** | | **$ (1,752,900)** |
| Ending cash balance roll forward | | $      847,100 |

**III.    Payments under the Plan**
**(continued from previous page)**

| Estimated payment date | | Post-Plan Confirmation | | | |
| --- | --- | --- | --- | --- | --- |
| | | FY 2021 | | | |
| | | 31-Dec-20 | 31-Mar-21 | 30-Jun-21 | 30-Sep-21 |
| Beginning cash balance | | $ 847,100 | $ 480,595 | $ 194,935 | $ 156,735 |
| Funding of capital expenditures reserves | $ (200,000) | - | - | - | - |
| **Projected NOI from Subchapter V Plan** | | $ (266,505) | $ (185,660) | $ 61,800 | $ 175,210 |
| Working capital reserve level | | (400,000) | (400,000) | (400,000) | (400,000) |
| **Cash available for distribution, net of working capital reserve** | | $ 180,595 | $ (105,065) | $ (143,265) | $ (68,055) |
| Projected distributions | **Total** | | | | |
| Cure payments | (4,785,802) | (50,000) | (50,000) | (50,000) | (50,000) |
| General unsecured creditors | (12,208,001) | (50,000) | (50,000) | (50,000) | (50,000) |
| **Total distribution** | | $ (100,000) | $ (100,000) | $ (100,000) | $ (100,000) |
| Ending cash balance roll forward | | $ 480,595 | $ 194,935 | $ 156,735 | $ 231,945 |

**III.    Payments under the Plan**
**(continued from previous page)**

|  |  | Post-Plan Confirmation | | | |
|---|---|---|---|---|---|
|  |  | FY 2022 | | | |
| **Estimated payment date** |  | **31-Dec-21** | **31-Mar-22** | **30-Jun-22** | **30-Sep-22** |
| Beginning cash balance |  | $    231,945 | $    472,530 | $    524,710 | $    478,065 |
| Funding of capital expenditures reserves | $    (200,000) | (25,000) | (25,000) | (25,000) | (25,000) |
| **Projected NOI from Subchapter V Plan** |  | **$    465,585** | **$    777,180** | **$    978,355** | **$ 1,053,265** |
| Working capital reserve level |  | (400,000) | (400,000) | (400,000) | (400,000) |
| **Cash available for distribution, net of working capital reserve** |  | **$    272,530** | **$    824,710** | **$ 1,078,065** | **$ 1,106,330** |
| Projected distributions | **Total** |  |  |  |  |
|     Cure payments | (4,785,802) | (100,000) | (500,000) | (500,000) | (500,000) |
|     General unsecured creditors | (12,208,001) | (100,000) | (200,000) | (500,000) | (500,000) |
| **Total distribution** |  | **$    (200,000)** | **$    (700,000)** | **$ (1,000,000)** | **$ (1,000,000)** |
| Ending cash balance roll forward |  | $    472,530 | $    524,710 | $    478,065 | $    506,330 |

## III.    Payments under the Plan
## (continued from previous page)

| Estimated payment date | Total | Post-Plan Confirmation FY 2023 31-Dec-22 | 31-Mar-23 | 30-Jun-23 | 30-Sep-23 | Total projected distributions | % recovery |
|---|---|---|---|---|---|---|---|
| Beginning cash balance | | $ 506,330 | $ 584,755 | $ 626,240 | $ 672,245 | | |
| Funding of capital expenditures reserves | $ (200,000) | (25,000) | (25,000) | (25,000) | (25,000) | | |
| **Projected NOI from Subchapter V Plan** | | $ 1,103,425 | $ 1,066,485 | $ 1,071,005 | $ 1,073,830 | $ 7,373,975 | |
| Working capital reserve level | | (400,000) | (400,000) | (400,000) | (400,000) | | |
| **Cash available for distribution, net of working capital reserve** | | $ 1,184,755 | $ 1,226,240 | $ 1,272,245 | $ 1,321,075 | | |
| Projected distributions | **Total** | | | | | | |
| Cure payments | (4,785,802) | (500,000) | (500,000) | (500,000) | (485,802) | (4,785,802) | *100%* |
| General unsecured creditors | (12,343,934) | (500,000) | (500,000) | (500,000) | (835,273) | (3,835,273) | *31%* |
| **Total distribution** | | $ (1,000,000) | $ (1,000,000) | $ (1,000,000) | $ (1,321,075) | $ (7,621,075) | |
| Ending cash balance roll forward | | $ 584,755 | $ 626,240 | $ 672,245 | $ 400,000 | | |

**Appendix E**
(Assumed Executory Contracts and Unexpired Leases) [8]
**Leased Locations**

| Name and Address of Party to Debtor's Executory Contract | Description of Executory Contract | Proposed Cure Amount and Anticipated Date of Cure Payment |
|---|---|---|
| Union Station Venture Corp. (PMI Location 20003) | 131 M Street, NE Washington, DC 20002 | $198,587.25 |
| Square 374, LLC (PMI Location 20009) | 900 New York Ave, NW Washington, DC 20001 | 60,000.00 |
| Square 407 Limited Partnership (PMI Location 20013) | 875 D Street, NW Washington, DC 20004 | $29,156.71 |
| Square 452, LLC (PMI Location 20014) | 600 Mass Ave, NW Washington, DC | $125,377.75 |
| South Capital, LLC (PMI Location 20025) | 25 M Street, NW Washington, DC | $0.00 |
| RPT1425 New York Avenue LLC (PMI Location 20042) | 1425 New York Ave, NW Washington, DC 20005 | $107,943.14 |
| Pennsylvania Building Association, LP (PMI Location 20045) | 1220 E Street, NW Washington, DC | $31,144.44 |
| 17 M Associates Limited Partners (PMI Location 20049) | 1615 M Street, NW Washington, DC 20036 | $46,912.30 |
| DeSales Associates (PMI Location 20051A) | 1725 DeSales Street, NW Washington, DC 20036 | $115,632.94 |
| CESC 1730 M Street, LLC (PMI Location 20051B) | 1730 M Street, NW Washington, DC 20036 | $99,260.28 |
| 2001 K LLC (PMI Location 20075) | 2001 K Street, NW Washington, DC | $84,525.00 |

---

[8] Assumption is subject to agreement with landlords or other contract counterparties as to the amount and timing of any cure payment and the term (including any extensions thereof) of the applicable leases or other agreements. The Debtor reserves the right to reject any of the contracts or leases where agreement cannot be reached with a landlord or contract counterparty. Accordingly, this Schedule is subject to amendment prior to confirmation of the Plan.

| | | |
|---|---|---|
| MAPS 1801 K Street LLC<br>(PMI Location 20078) | 1820 L Street, NW<br>Washington, DC 20005 | $936.04 |
| 2000 L Owner LLC<br>(PMI Location 20080) | 2001 K Street<br>Washington, DC | $34,176.00 |
| 1325 Owners LLC<br>(PMI Location 20093) | 1325 G Street, NW<br>Washington, DC 20005 | $222,920.28 |
| Paris Associates Limited<br>Partnership<br>(PMI Location 20107) | 1611 N. Kent Street<br>Arlington, VA 22209 | $55,667.00 |
| Geneva Associates Owner LLC<br>(PMI Location 20108) | 1777 N. Kent Street<br>Arlington, VA 22209 | $76,194.00 |
| Wilson Plaza East, LLC<br>(PMI Location 20110) | 1800 N. Kent Street<br>Arlington, VA 22209 | $143,247.50 |
| Foreign Affairs Recreation<br>Association<br>(PMI Location 20122, 20123) | 22nd and C Streets, NW<br>Washington, DC 20520<br>8500 N. Fort Meyer Drive<br>Arlington, VA 22209 | $7,649.10 |
| Maryland Dept. of General<br>Services<br>(PMI Location 30203) | 300 W. Preston Street<br>Baltimore, MD 21201 | $17,442.48 |
| W.W. Grainger, Inc.<br>(PMI Location 30230) | 100 Grainger Parkway<br>Lake Forest, IL 60045 | $2,080.36 |
| Fourth Gould Ltd Partnership<br>(PMI Location 30208) | 810 N. Charles Street<br>Baltimore, MD 21201 | $15,450.00 |
| Fourth Gould Ltd Partnership<br>(PMI Location 30210) | 1010 N. Charles Street<br>Baltimore, MD 21201 | $1,200.00 |
| A&G Ltd Partnership<br>(PMI Location 30209) | 910 N. Charles Street<br>Baltimore, MD 21201 | $12,016.66 |
| A&G Ltd Partnership<br>(PMI Location 30210) | 1000 N. Charles Street<br>Baltimore, MD 21201 | $13,733.34 |
| TOTAL: | | $1,501,252.57 |

**Appendix E**
(Assumed Executory Contracts and Unexpired Leases)
**Managed Locations**

| Name and Address of Party to Debtor's Executory Contract | Description of Executory Contract | Proposed Cure Amount and Anticipated Date of Cure Payment |
|---|---|---|
| 3307 M Street, LP<br>(PMI Location 1006)<br>3345 M Street LP<br>(PMI Location 1007) | 3333 M Street, NW<br>Washington, DC 20007<br>3307 M Street, NW<br>Washington, DC 20007 | $71,289.64 |
| Jaguar Properties<br>(PMI Location 10012) | 1212 New York Ave, NW<br>Washington, DC 20005 | $15,196.87 |
| Bozzuto Management Company<br>(PMI Location 10015) | 625 Monroe Street, NE<br>Washington, DC 20005 | $0.00 |
| JBG Smith<br>(PMI Locations 10018-10019, 10037-10038, 10052, 10056, 10072, 10081, 10083-10085, 10087-10089, 10101-10105, 10131-10132) | 1825 CT Ave, NW<br>Washington, DC 20009<br>1875 CT Ave, NW<br>Washington, DC 20009<br>6701 Democracy Boulevard<br>Rockville, MD<br>1101 17th Street, NW<br>Washington, DC 20036<br>1900 N street, NW<br>Washington, DC 20036<br>201 12th Street<br>Gateway North<br>Arlington, VA 22201<br>1750 Crystal Drive<br>241 18th Street<br>Crystal Square 3<br>Arlington, VA 22202<br>223 23rd Street<br>Arlington, VA 22202<br>1800 S. Bell Street<br>Arlington, VA 22202<br>200 12th Street<br>Arlington, VA 22202<br>1235 Clark Street<br>Crystal City, VA<br>1225 S. Clark Street<br>Arlington, VA 22202<br>1215 S. Clark Street<br>Arlington, VA 22202<br>2345 Crystal Drive<br>Arlington, VA 22202 | $2,655,942.11 |

|  |  |  |
|---|---|---|
|  | 2100-2300 Clarendon Blvd<br>Arlington, VA 22201 |  |
| Bozzuto Management Company<br>(PMI Location 10020) | 3710 Newark St, NW<br>Washington, DC | $0.00 |
| 1919 M Street Associates Limited<br>Partnership<br>(PMI Location 10027) | 1919 M Street, NW<br>1227 20th Street, NW<br>Washington, DC 20036 | $21,532.45 |
| Gudelsky Company LLC<br>(PMI Location 10036) | 8630 Fenton Street<br>Silver Spring, MD 20910 | $15,729.50 |
| 1722 Eye Street Associates, LP<br>(PMI Location 10042) | 1722 Eye Street, NW<br>Washington, DC 20006 | $2,938.00 |
| Sodexo Operations LLC<br>(PMI Locations 10043, 10045) | 1900 G Street, NW<br>Washington, DC<br>1900 Pennsylvania Avenue<br>Washington, DC | $0.00 |
| City Center Parking, Inc.<br>(PMI Location 10046) | 1401 H Street, NW<br>Washington, DC 20005 | $58,148.61 |
| 1150 18th SPE L.L.C.<br>(PMI Location 10050) | 1150 18th Street, NW<br>Washington, DC 20036 | $26,946.48 |
| Third Gould LLC<br>Gould Jefferson Davis Highway<br>  Parking Garage LLC<br>GA Crystal Drive Associates LLC<br>(PMI Locations 10060, 10061,<br>10062) | 2611 Jefferson Davis Hwy<br>Arlington, VA 22202<br>2711 Jefferson Davis Hwy<br>Arlington, VA 22202<br>2600 Crystal Dr<br>Arlington, VA 22202 | $127,330.25 |
| Columbia Plaza Limited<br>Partnership<br>(PMI Location 10500) | 2400 Virginia Ave, NW<br>Washington, DC 20037 | $270,879.00 |
| CT Holding Co. LLC<br>(PMI Location 10600) | Riverdale Park Station<br>460 Van Buren Street<br>Riverdale, MD | $0.00 |
| Waterloo Group Limited<br>Partnership<br>(PMI Location 30130) | 610 Calvert Street<br>Baltimore, MD 21202 | $5,366.35 |
| Bozzuto Management Company<br>(PMI Location 30313) | 80 W. Oliver Street<br>Baltimore, MD 21217 | $8,504.00 |

| | | |
|---|---|---|
| Merritt Canton BP LLC<br>(PMI Location 30401) | 2066 Lord Baltimore Drive<br>Baltimore, MD 21244 | $0.00 |
| Livestock LLC<br>(PMI Location 10700) | 1725 DeSales Street, NW<br>Suite 900<br>Washington, DC 20036 | $4,746.51 |
| TOTAL: | | $3,284,549.77 |

**Appendix F**
(Rejected Executory Contracts
and Unexpired Leases) [9]

| Name and Address of Party to Debtor's Executory Contract | Description of Executory Contract | Claim |
|---|---|---|
| Massachusetts Court Apartments LLC (PMI Location 10017) | 300 Mass Ave, NW Washington, DC 20005 | $88,183.26 |
| MEPT Anthology LLC (PMI Locations 10026, 10029A, 10029B) | 625 H Street, NE Washington, DC | $17,772.77 |

---

[9] The Debtor reserves the right to amend this exhibit prior to confirmation depending on the outcome of discussion with landlords and contract counterparties.