

**THOMAS J. CATLIOTA**
**U.S. BANKRUPTCY JUDGE**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**at Greenbelt**

| | | |
|---|---|---|
| In re: | * | Case No.   20-15026 |
| Parking Management, Inc. | * | Chapter    11 |
| Debtor | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**MEMORANDUM OF DECISION**

The new Subchapter V of Chapter 11 offers small business debtors a streamlined Chapter 11 procedure that is intended to be less costly and time-consuming than a traditional case.  To be eligible for Subchapter V, a debtor must have "noncontingent liquidated secured and unsecured debts as of the date of the filing of the petition . . . in an amount not more than $7,500,000."  11 U.S.C. §1182(1)(A).  The dispute before the court is whether the debtor Parking Management Inc. meets this eligibility test.

On the petition date, May 7, 2020, the debtor sought authority to reject 12 leases as of that date.  The court approved the lease rejections by orders entered on May 21, 2020, authorizing the rejection of seven leases as of the petition date and five leases as of May 12, 2020.  Creditor JBGS Management OP, L.P., ("JBGS") and John P. Fitzgerald, III, the Acting United States Trustee for Region 4 (the "UST"), joined by Union Investment Real Estate GmbH and 2201 Limited Partnership II and Connecticut/DeSales, LLC, contend the resulting lease rejection damages should be included in the eligibility determination.

1

Further, prior to the petition, the debtor obtained approximately $1.8 million in funds under the Paycheck Protection Program (the "PPP") created by the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020). JBGS, but not the UST, contends the PPP obligation should be included in the debt limit determination.

If either the lease rejection claims or the PPP claim is included in the debt limit determination, the debtor would exceed the limit in §1182. For the reasons stated below, the court concludes that the lease rejection claims were contingent as of the date of filing, and the PPP claim was contingent and unliquidated as of that date. Therefore, neither is included in the debt limit determination and the debtor is eligible to proceed under Subchapter V.

## Jurisdiction

The court has jurisdiction pursuant to 28 U.S.C. §1334(a), §157(a), and Local Rule 402 of the United States District Court for the District of Maryland. The resolution of the debtor's eligibility to qualify for a particular type of relief under the Bankruptcy Code is a statutorily core proceeding under 28 U.S.C. §157(b)(2)(A), and a constitutionally core proceeding under the standards of *Stern v. Marshall*, 564 U.S. 462, 131 S. Ct. 2594 (2011).

## Findings of Fact

Debtor filed for relief on May 7, 2020. On the petition, it designated itself a debtor "as defined in 11 U.S.C. §1182(1),[1] its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000" and "it chooses to proceed under Subchapter V of Chapter 11." ECF 1 at p. 2 (emphasis eliminated).

The debtor is one of the largest parking operators in the Mid-Atlantic area. As of April 30, 2020, it leased or managed approximately 100 parking facilities throughout the Northern

---

[1] Unless otherwise noted, all statutory references herein are to the Bankruptcy Code, 11 U.S.C. §§101 *et seq.*, as currently in effect.

Virginia, Washington D.C., and Baltimore, Maryland metropolitan areas, and employs 191 people.  The debtor uses two basic structures for its parking operations.  Under the first structure, the debtor leases a parking lot from a property owner, operates the parking facility, and pays rent to the owner.  Under the second structure the debtor manages a parking facility for the property owner pursuant to a management agreement and receives a management fee as compensation for doing so.  ECF 7 at ¶¶7-8.

Prior to the petition, the debtor determined it should reject twelve parking leases.  On the petition date, it filed a motion to reject the leases as of that date.  ECF 14.  In the motion, the debtor stated it closed the facilities before the petition due to diminished revenues resulting from the COVID-19 pandemic and asked that it be allowed to reject the leases as of the petition date. After notice, no party objected to the rejection of the leases, but several landlords objected to the request to reject the leases as of the petition date.  On May 21, 2020, the court issued two orders resolving the motion.  Without objection by the pertinent landlords, the court authorized the rejection of seven of the leases "as of" the petition date.  ECF 77.  By agreement with landlords for five of the leases, the court authorized the rejection of the remaining leases as of May 12, 2020.  ECF 75.  Landlords representing five of the seven leases that were rejected as of the petition date have filed proofs of claim for the rejection damages in the aggregate amount of $1,765,542.63.  *See* Claim 27-1, Part 2 at p. 3; Claim 31-1, Part 2 at p. 3; Claim 32-1, Part 2 at p. 3.

Prior to the petition the debtor applied for small business funding under the PPP, and received $1,862,723.84 on April 30, 2020, from Truist Bank.  To evidence the PPP loan the debtor executed a Paycheck Protection Program Promissory Note in that amount.  Proof of Claim 1-1, Part 2.  The terms of the note are addressed further below.

The debtor and JBGS have been involved in an ongoing dispute during the case that is the subject of *JBGS Management OP, L.P. v. Parking Management, Inc.*, Adversary Proceeding No. 20-00195.  There, it was established that the debtor and JBGS entered into a parking management agreement dated January 1, 2006, as subsequently amended, under which the debtor manages and operates 42 parking facilities on behalf of JBGS.  The debtor collects parking revenue, pays certain authorized expenses, pays itself a management fee, and remits the net parking revenues to JBGS.  JBGS contends that on the petition date, the debtor held $2,803,376 of its net monthly parking revenues that the debtor failed to pay to it.  In the adversary proceeding, it seeks the imposition of a constructive trust over the funds.  As pertinent here, JBGS contends it holds a noncontingent, liquidated claim in that amount until its claim is satisfied.

The debtor filed its original schedules on May 20, 2020.  ECF 69.  It listed no secured claims on Schedule D, and $6,169,500.01 of priority and unsecured claims on Schedule E/F.  *Id*. at pp. 11-30.  The debtor listed the JBGS claim as contingent in an "unknown" amount.  *Id.* at p. 20.  It included a claim of $1,862,723.84 in favor of Truist Bank for "Paycheck Protection Program" that was not designated as contingent or unliquidated.  *Id*. at p. 27.  The debtor also listed unpaid prepetition rent claims due on its leases as of the petition date.

JBGS timely objected to the debtor's designation as a small business under Subchapter V, arguing that its claim was neither unknown nor contingent.  ECF 114.  It argued that if the debtor listed its claim on the schedules as noncontingent and liquidated, the debtor would exceed the debt limits.

On July 8, 2020, the debtor filed amended schedules, again showing it was below the debt limits of §1182.  On Schedule D, it listed noncontingent liquidated secured claims of $50,997.39.  ECF 148 at pp. 6-8.  On Schedule E/F, it listed total priority and unsecured claims

4

of $8,871,931.56, but that amount included the JBGS claim in the amount of $2,655,942.11, which the debtor designated as contingent and disputed. *Id.* at p. 18. The amount also included the $1,862,723.84 claim of Truist Bank, describing it as "Paycheck Protection Program (Grant)," also designated as contingent, unliquidated and disputed. *Id.* at p. 25. The debtor again included unpaid prepetition rent claims due on its leases as of the petition date and did not list lease rejection claims. The amended schedules led to further filings by the parties, ECF 161, 192, 193, 194, and 198, and the court held hearings on July 29, 2020, and August 12, 2020.

## Conclusions of Law

The Small Business Reorganization Act, Pub. L. 116-54, 133 Stat. 1079 (Aug. 23, 2019) ("SBRA") "streamline[s] the bankruptcy process by which small business debtors reorganize and rehabilitate their financial affairs." H.R. Rep. No. 116-171, at p. 1 (2019), *available at* https://www.congress.gov/116/crpt/hrpt171/CRPT-116hrpt171.pdf . The SBRA created Subchapter V under Chapter 11 of the Bankruptcy Code to permit eligible small business debtors "to file bankruptcy in a timely, cost-effective manner." *Id.* at p. 4 (quoting statement of Rep. Ben Cline, the bill's sponsor, at a June 25, 2019 hearing).

The SBRA became effective on February 19, 2020. When enacted, Subchapter V was limited to debtors with no more than $2,725,625 in noncontingent liquidated debts as of the date of the filing of the petition. In response to the COVID-19 pandemic, the President signed into law the CARES Act, which temporarily increased, until March 27, 2021, the Subchapter V debt limit to $7,500,000.

The debtor filed this case after the enactment of the CARES Act. To be eligible for Subchapter V relief, the debtor's "aggregate noncontingent liquidated secured and unsecured debts as of the date of the filing of the petition" can be "in an amount not more than $7,500,000."

§1182(1)(A).[2]  The debtor's amended Schedules D and E/F list total secured and unsecured debts of $8,922.928.95.  The amended schedules designated the $1,862,723.84 of PPP funds as contingent and unliquidated, thus reducing the potential noncontingent and liquidated debts to below the debt limit.  ECF 148.  The amended schedules also do not list lease rejection claims. *Id.*  Both the PPP funds and the lease rejection claims must be contingent and unliquidated as of the date of filing for the debtor to be eligible for Subchapter V.[3]

The court is not aware of any decisions addressing the eligibility requirements of §1182. Many cases, however, have addressed similar eligibility debt limitation language under Chapters 12 and 13.[4]  The court begins by looking at these decisions for guidance.

Although the Fourth Circuit has not addressed the question, many courts have recognized the need for an efficient, expedient resolution of the debt eligibility determination in Chapter 13 cases.  In *Comprehensive Accounting Corp. v. Pearson (In re Pearson)*, 773 F.2d 751 (6th Cir.

---

[2]  Section 1182 provides:
    In this subchapter:
    (1) Debtor.--The term "debtor"--
    (A) subject to subparagraph (B) . . . a person engaged in commercial or business activities (including any affiliate of such person that is also a debtor under this title and excluding a person whose primary activity is the business of owning single asset real estate) that has aggregate noncontingent liquidated secured and unsecured debts as of the date of the filing of the petition or the date of the order for relief in an amount not more than $7,500,000 (excluding debts owed to 1 or more affiliates or insiders) not less than 50 percent of which arose from the commercial or business activities of the debtor[.]
§1182(1)(A).

[3] The debtor and JBGS dispute whether the JBGS claim is noncontingent and liquidated.  Because the court concludes that the lease rejection claims and the PPP funds are contingent and unliquidated, it need not address this issue.

[4]  Section 109(e) provides:
    (e) Only an individual with regular income that owes, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts of less than $250,0002 and noncontingent, liquidated, secured debts of less than $750,0002, or an individual with regular income and such individual's spouse, except a stockbroker or a commodity broker, that owe, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts that aggregate less than $250,0002 and noncontingent, liquidated, secured debts of less than $750,0002 may be a debtor under chapter 13 of this title.
§109(e).

1985), the court analogized the debt eligibility requirements of Chapter 13 to the amounts required for diversity jurisdiction under 28 U.S.C. §1332:

> [I]t is necessary that the procedures for determining initial jurisdiction cannot be allowed to dominate the proceedings themselves nor to delay them unduly. As important as this may be in the ordinary diversity litigation in a district court, it is even more important with respect to Chapter 13 proceedings for time is of the essence. The resources of the debtor are almost by definition limited and the means of determining eligibility must be efficient and inexpensive. To allow an extensive inquiry in each case would do much toward defeating the very object of the statute.

*Pearson*, 773 F.2d at 757. The Bankruptcy Appellate Panel of the Sixth Circuit expanded on this comparison in *In re Perkins*, 581 B.R. 822, 832 (B.A.P. 6th Cir. 2018) noting that, in the similar context of Chapter 12, eligibility is based on debts as of the petition date and not based on "computing eligibility after a hearing on the merits of the claims." *Id.* at 832. The court looked to whether "from the face of the schedules it is apparent to a legal certainty that the debtor is beyond the debt limit" and also considered "if evidence shows that the amounts were inaccurately scheduled in bad faith for the purpose of making the debtor eligible for Chapter 13." *Id.* at 834; *cf. Scovis v. Henrichsen (In re Scovis)*, 249 F.3d 975, 982 (9th Cir. 2001) ("We now simply and explicitly state the rule for determining Chapter 13 eligibility under §109(e) to be that eligibility should normally be determined by the debtor's originally filed schedules, checking only to see if the schedules were made in good faith.").

In making the determination, however, the court:

> should neither place total reliance upon a debtor's characterization of a debt nor rely unquestioningly on a creditor's proof of claim, for to do so would place eligibility in control of either the debtor or the creditor. *In re Madison*, 168 B.R. at 989. At a hearing on eligibility, the court should thus, canvass and review the debtor's schedules and proofs of claim, as well as other evidence offered by a debtor or the creditor to decide only whether the good faith, facial amount of the debtor's liquidated and non-contingent debts exceed statutory limits.

7

*Barcal v. Laughlin (In re Barcal)*, 213 B.R. 1008, 1015 (B.A.P. 8th Cir. 1997).  Further, a bankruptcy court can "scrutinize and redesignate the characterization by a debtor of any given debt when that characterization is the subject of a case or controversy."  *In re Stern*, 266 B.R. 322, 326 (Bankr. D. Md. 2001); *see also In re Kelly*, No. 18-13244-WIL, 2018 WL 4354653, at *5 (Bankr. D. Md. Sept. 11, 2018) (Bankruptcy court can review a debt scheduled as "unknown" or "unliquidated" when it appears to a legal certainty to be owed in an amount other than what the debtor maintains.); *In re De Jounghe*, 334 B.R. 760, 768 (B.A.P. 1st Cir. 2005).

Subchapter V presents a similar statutory urgency to resolve eligibility determinations as Chapters 12 and 13.  Subchapter V was established to provide "an expedited process for small business debtors to reorganize quickly, inexpensively, and efficiently."  *In re Seven Stars on the Hudson Corp.,* -- B.R. -- , 2020 WL 4558344, *1 (Bankr. S.D. Fla. 2020); *see supra* H.R. Rep. No. 116-171.  The debtor is required to file a plan within 90 days of the petition, unless extended if the court finds the "need for the extension is attributable to circumstances for which the debtor should not justly be held accountable."  §1189(b).  A debtor must state in the petition whether it is a debtor as defined in §1182(1) and whether it elects to proceed under Subchapter V.  Federal Rule of Bankruptcy Procedure 1020(b) requires that the United States Trustee or a party in interest object to the debtor's election "no later than 30 days after the conclusion of the meeting of creditors held under §341(a) of the Code, or within 30 days after any amendment to the statement whichever is later."  Fed. R. Bankr. P. 1020.[5]

The standards developed by the courts for Chapters 12 and 13 eligibility determinations provide useful guidance for §1182.  However, when Congress expanded the reach of Subchapter V to debtors who have up to $7.5 million in debts, it made Subchapter V available to entities having more complex creditor relationships than a debtor in a typical Chapter 12 or 13 case.

---

[5]  In contrast, there is no deadline for challenging the debtor's eligibility under Chapter 13.

8

This case is an example.  Few, if any, Chapter 13 debtors or Chapter 12 family farmers will have claims arising from their management of 42 operating facilities, or have received substantial PPP funds, or seek to reject numerous real estate leases in so-called first day motions.  These more complex creditor relationships may well lead to bona fide disputes over the proper characterization of creditor claims.

The court need not find a lack of good faith or candor to conclude it should review the claims in this case.  There is reasonable ground to dispute whether the lease rejection claims and the PPP funds were contingent and/or unliquidated as of the petition date—they present a valid "case or controversy."  *In re Stern*, 266 B.R. at 326.  Further, the debtor amended its schedules after the deadline expired for challenging its eligibility under Subchapter V and, indeed, after its eligibility was challenged.  Therefore, the debtor's characterization of the claims is appropriate for court review.

In doing so, the court notes that §1182 requires the consideration of debts "as of" the date of the filing of the petition, while the Chapter 13 eligibility determination looks to debts "on the date" of filing the petition.  *See* §109(e).  The court finds no discernible difference in this language, considering how the phrase "as of" as used in the Bankruptcy Code is interpreted by the courts.  Most notably, §541 includes as property of the estate all legal and equitable interest of the debtor "as of" the commencement of the case.  The phrase "as of" places a temporal limitation on the reach of the bankruptcy estate.  *In re Chernushin*, 911 F.3d 1265, 1269 (10th Cir. 2018), *cert. denied sub nom. Cohen v. Chernushin*, 139 S. Ct. 2649, 204 L. Ed. 2d 284 (2019).  It "establishes a clear-cut date after which property acquired by the debtor will normally not become property of the bankruptcy estate."  *Id.*; *see Am. Bankers Ins. Co. of Fla. v. Maness*, 101 F.3d 358, 362 (4th Cir. 1996) (other than limited statutory exceptions, property not owned at the time of the petition but only subsequently acquired by the debtor does not become property

of the bankruptcy estate). "The normal rule of statutory construction" is that "identical words used in different parts of the same Act are intended to have the same meaning." *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 562, 115 S. Ct. 1061 (1995).

**The Lease Rejection Claims.**

As set forth in the Findings of Fact, on May 21, 2020, the court authorized the rejection of five parking leases as of May 12, 2020, and without objection by the landlords, seven leases as of May 7, 2020, the petition date. ECF 75, 77. The debtor did not include the lease rejection claims on its schedules. The parties dispute whether the lease rejection claims were contingent as of the petition date.

Noncontingent debts are those where "all events necessary to give rise to liability take place prior to filing the petition." *In re Green,* 574 B.R. 570, 576–77 (Bankr. E.D.N.C. 2017) (cleaned up); *see In re Aparicio,* 589 B.R. 667, 674-75 (Bankr. E.D. Cal. 2018) (all events that triggered liability occurred prepetition). A debt is deemed contingent if liability relies on a future extrinsic event which may never occur. *Id*. at 577 (quoting *In re Hanson,* 275 B.R. 593, 596 (Bankr. D. Colo. 2002) (quoting *In re Nesbit,* No. 99-28414JKF, 2000 WL 294834 at *2 (Bankr. W.D. Pa. March 16, 2000)). Contingent liabilities therefore are a class of liabilities in which the obligation to pay does not arise until the occurrence of a "triggering event or occurrence . . . reasonably contemplated by the debtor and creditor at the time the event giving rise to the claim occurred." *In re Barcal*, 213 B.R. at 1013 (cleaned up).

Section 365(a) provides that a trustee or debtor in possession, "may assume or reject any . . . unexpired lease of the debtor." §365(a). "The authority to reject an executory contract [or unexpired lease] is vital to the basic purpose of a Chapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization." *In re Shangra-La, Inc.*, 167 F.3d 843, 849 (4th Cir. 1999) (quoting *NLRB v.*

*Bildisco & Bildisco,* 465 U.S. 513, 528, 104 S. Ct. 1188 (1984)).  Similarly, the power to assume

and/or assign an unexpired lease "gives the trustee significant flexibility in managing the estate."

*In re Shangra-La, Inc.*, 167 F.3d at 849.

Section 365(a) expressly makes the assumption or rejection of an executory contract or

unexpired lease "subject to the court's approval."  §365(a).  A motion to assume, reject, or assign

an executory contract or unexpired lease is governed by Fed. R. of Bankr. P. 9014.  Fed. R.

Bankr. P. 6006(a).  Notice must be given to the nondebtor party to the contract or lease, the

United States Trustee, and any other parties in interest as the court may direct.  *Id*. 6006(c).  A

debtor's decision to reject an executory contract or unexpired lease "is to be accorded the

deference mandated by the sound business judgment rule as generally applied by courts to

discretionary actions or decisions of corporate directors."  *Lubrizol Enterprises, Inc. v. Richmond*

*Metal Finishers, Inc.*, 756 F.2d 1043, 1046–47 (4th Cir. 1985).

Because the rejection of an executory contract or unexpired lease requires court approval,

rejection is not a unilateral, independent process that can be accomplished by the debtor alone:

> [A] debtor may not agree to assume or reject an executory contract until after the
> bankruptcy case is commenced and the debtor is acting in the capacity of debtor-
> in-possession.  Even then, the Bankruptcy Code prevents the debtor-in-possession
> from making a unilateral decision to assume or reject a contract.  Section 365(a)
> requires court approval of the decision and §1109 states that a "party in interest,
> including . . . a creditors' committee, an equity security holders' committee, a
> creditor, an equity security holder, or any indenture trustee, may raise and may
> appear and be heard on *any issue* in a case under [chapter 11]." 11 U.S.C. §1109
> (emphasis added).

*In re Trans World Airlines, Inc.*, 261 B.R. 103, 115 (Bankr. D. Del. 2001).  The requirement for

court approval is particularly important in the rejection of unexpired commercial leases.   As the

Fourth Circuit has recognized, a "leasehold interest often proves to be the most valuable asset in

a small business bankruptcy."  *In re Shangra-La, Inc.*, 167 F.3d at 849.

The rejection or assumption of an executory contract or unexpired lease does not determine whether the nondebtor party holds a claim; it establishes the nature of the claim as either "a pre-petition obligation of the debtor or as an administrative expense entitled to the highest priority." *In re Stewart Foods, Inc.*, 64 F.3d 141, 144 (4th Cir. 1995) (citing *Leasing Serv. Corp. v. First Tenn. Bank Nat'l Assoc.*, 826 F.2d 434, 437 (6th Cir. 1987)).

> The rejection of an executory contract constitutes a breach of the contract, and a party's damages resulting from that rejection are treated as a pre-petition claim and receive the priority provided to general unsecured creditors. Where the debtor-in-possession assumes an executory contract, the expenses and liabilities incurred may be treated as administrative expenses and receive the highest priority on the debtor's estate.

*Id.*; *see* §365(g). Until an executory contract is assumed or rejected, the debtor's obligations under the contract are an administrative expense claim of the estate. *See e.g.,* §365(d)(5).

Here, the rejection of leases was not approved until May 21, 2020; any resulting lease rejection claims thus were contingent obligations until that time. Five of the leases were rejected as of May 12, 2020. The debtor's request to reject these leases was pending, and any lease rejection claims were contingent, until the court resolved the debtor's rejection motion. The prerequisites to the debtor's rejection of the leases, and any resulting lease rejection claims, were necessarily post-petition events. Consequently, the lease rejection claims were contingent as of the petition date and remained so until the issuance of the Court's order approving the rejections. "[A]ll events necessary to give rise" to the lease rejection claims did not occur as of the petition date. *In re Green*, 574 B.R. at 576.

Seven of the leases were rejected "as of" the petition date. The rejection of these leases was also approved by the court on May 21, 2020. Superficially, at least, the deemed effective date of the rejection—"as of" the petition date—appears to match §1182's statutory requirement to consider debts as they exist "as of" the date of filing. But this question gives the court pause.

Resolution of this question requires the court to delve into the extent to which courts take into account post-petition events when making an eligibility determination, at least in Chapters 12 and 13.  Many post-petition actions could result in contingent claims becoming noncontingent after the case is filed.  As one court succinctly stated:

> Numerous events may occur postpetition to affect a debtor's total secured or unsecured debt.  Collateral may be liquidated, converting a secured claim to an unsecured deficiency claim.  Contingent personal guaranties may be liquidated after the creditor pursues a co-debtor, surety, or principal.  A creditor may file a postpetition claim treated under the Code as prepetition, such as a lease rejection claim under § 365(g) or a § 1305 claim.  Or, as was the case here, a judgment might be modified or vacated by the trial court that issued the judgment or later on appeal.
>
> The majority of courts that have considered the effect of a postpetition event on eligibility to file (or be converted) to Chapter 13 have concluded that postpetition events should not be considered in determining eligibility.  To hold otherwise would mean that a debtor could float in and out of Chapter 13 eligibility during the course of a case, depending on what happens, which of course makes no legal or practical sense.
>
> The . . . plain language of § 109(e) requires consideration of the debts as they exist as of the petition date, irrespective of postpetition events.  *E.g., In re Wiencko*, 275 B.R. 772 (Bankr. W.D. Va. 2002); *In re Slack*, 187 F.3d 1070 (9th Cir. 1999); *In re Snell*, 227 B.R. 127 (Bankr. S.D. Ohio 1998); *In re Harwood*, 519 B.R. 535, 539–40 (Bankr. N.D. Cal. 2014); *In re Pearson*, 773 F.2d 751, 758 (6th Cir. 1985) ("[T]he fact that some later resolution of the conflict might render more certain the precise nature of the debt itself . . . is relatively immaterial in determining the debtors' financial condition and Chapter 13 eligibility on the date the petition is filed. . . .  We do not believe that the statute requires any more" than a realistic look at "the state of the debtors' affairs" on the petition date).

*In re West*, No. 16-40358-CAN7, 2017 WL 746250, at *16 (Bankr. W.D. Mo. Feb. 24, 2017).

The court agrees with the foregoing analysis, even for the leases rejected "as of" the petition date.  As with the leases rejected as of May 12, 2020, the prerequisites to the debtor's rejection of the leases, and any resulting lease rejection claims, were necessarily post-petition events.  The lease rejection claims were contingent on the petition date and for two weeks following that date, and could only become noncontingent when the court approved the rejection.

13

"All of the events necessary to give rise" to the lease rejection claims did not occur until two weeks after the petition date.

Not only does this approach meet the statutory directive to determine debt limits as they exist as of the date of filing, but it has the very real benefit of providing certainty to the process. As stated above, Subchapter V is designed to provide "an expedited process for small business debtors to reorganize quickly, inexpensively, and efficiently." *In re Seven Stars on the Hudson Corp.,* 2020 WL 4558344 at *1. Opening up eligibility determinations to post-petition events, even if deemed to apply retroactively, is contrary to the purpose and spirit of Subchapter V, and could nullify the very benefits it is intended to convey.

Finally, the objecting parties point to §365(g), which makes the rejection of an unexpired lease that has not been assumed a "breach of such contract or lease . . . immediately before the date of the filing of the petition." §365(g). They argue that §365(g) establishes that the rejection claims are prepetition debts, and therefore must be included in the debt limit determination upon rejection. The argument is unavailing. The question is not whether lease rejection claims are treated as prepetition debts once the leases are rejected—that point is not disputable—but whether the lease rejection claims were noncontingent debts as of the date of filing. The claims were contingent until the court approved the lease rejections.

The court therefore concludes that the lease rejection claims were contingent as of the date of filing and are not considered in the debt limitation determination.

**The PPP Funds.**

Prior to the petition, the debtor received $1,862,723.84 of PPP funds from Truist Bank. ECF 198. On May 13, 2020, the court entered an order requiring the debtor "to abide by the certifications the debtor has made as to the limited use of PPP funds in a manner and for purposes permitted by the CARES Act and other laws governing the use of such funds." ECF

37.  In connection with the dispute over the debtor's eligibility, it submitted a declaration by its Director of Human Resources stating that, since the bankruptcy filing, the debtor has used all of the loan proceeds in accordance with the PPP requirements and intends to seek forgiveness of the entire balance in accordance with the PPP requirements.  ECF 198.

The debtor contends any obligation to repay the PPP funds was both contingent and unliquidated as of the date of filing.  It argues the PPP funds are a government grant and it only must repay them if it does not comply with PPP requirements.  JBGS contends the obligation to repay the PPP funds is evidenced by a promissory note in a fixed amount, and therefore the funds were a noncontingent liquidated debt as of that date.  Notably, neither the UST, nor Truist Bank, which advanced the PPP funds, joins JBGS's contention that the PPP funds should be included in the debt limit determination as a noncontingent liquidated debt.  The court concludes that the debtor's obligation to repay the PPP funds was contingent and unliquidated as of the date of filing, and the PPP debt is therefore excluded from the eligibility determination.

The PPP was created by the CARES Act and intended to provide emergency economic assistance to help individuals and businesses cope with the economic and public health crises triggered by the worldwide COVID-19 pandemic.  *See* SBA, Interim Final Rule, 85 Fed. Reg. 20,811 (April 15, 2020) (the "First Interim Final Rule").  "The intent of the CARES Act is that SBA provide relief to America's small businesses expeditiously" with a "focus on keeping workers paid and employed."  *Id.*

Section 1102 of the CARES Act, codified at 15 U.S.C. §636(a)(36), temporarily permits the SBA to guarantee loans under a new program titled the "Paycheck Protection Program." Section 1106 of the CARES Act, codified at 15 U.S.C. §9005, provides for forgiveness of up to the full principal amount of qualifying loans guaranteed under the PPP.  *See id*.

The PPP is a unique government financial accommodation created to provide businesses with necessary financial relief to withstand the devasting economic effects of the COVID-19 pandemic. Due to its unique nature, courts have not agreed on the proper characterization of the nature of the PPP. The issue has arisen most often in bankruptcy proceeding when debtors contend the Administrator of the United States Small Business Administration ("SBA") violated the anti-discrimination provisions of §525(a) by excluding debtors in bankruptcy from participating in the PPP.

In *iThrive Health, LLC v. Carranza*, this court addressed the issue. For purposes of §525, this court characterized the PPP as a loan accompanied by a government guaranty that will result in forgiveness of the loan. *iThrive Health, LLC v. Carranza*, No. 20-00151, ECF 24 at 8 (Bankr. D. Md. June 8, 2020). It applied the rationale of the Fourth Circuit in *Ayes v. U.S. Dep't of Veterans Affairs*, 473 F.3d 104 (4th Cir. 2006), and concluded that, although the PPP is akin to a grant, the PPP did not meet the specific standards in *Ayes* to be a "license, permit, charter, franchise or other similar grant" so as to fall within the ambit of §525(a). *Id.*

In so holding, however, the court recognized that:

> The central characteristic of the PPP is that the recipient fully anticipates the SBA will satisfy its guaranty by paying the loan to the issuing financial institution . . . . *PPP funds, in essence, are a distribution of government funds to be used by businesses to survive the devastating economic consequences of the COVID-19 pandemic.* They are intended to enable businesses to pay employees and certain other critical expenses that they likely would not otherwise be able to pay.

*Id.* (emphasis added).

Here, the court is being called upon to address a different question: whether the PPP is a noncontingent and liquidated debt as of the petition date. It might seem apparent that a financial accommodation intended to provide "a distribution of government funds to be used by businesses to survive the devastating economic consequences of the COVID-19 pandemic"

16

would be a contingent and unliquidated debt, but that is the question the court must resolve.  The parties have not cited to any case that has addressed this question.

In considering whether the PPP is contingent, the court considers whether "all of the events necessary to give rise to liability [took] place prior to filing the petition," or whether "liability relies on some future extrinsic event which may never occur."  *In re Green,* 574 B.R. at 577-580.  The obligation to pay a contingent liability does not arise until the occurrence of a "triggering event or occurrence . . . reasonably contemplated by the debtor and creditor at the time the event giving rise to the claim occurred."  *In re Barcal*, 213 B.R. at 1013.

To resolve the dispute, the court must determine the nature of the PPP debt and the debtor's obligation to repay it.  Under the PPP, an applicant submits a PPP Borrower Application Form to a SBA approved lending institution.  The loan forgiveness is recognized and acknowledged in the application.  As the application existed when the debtor applied, it provided:

> I understand that loan forgiveness will be provided for the sum of documented payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities, and not more than 25% of the forgiven amount may be for non-payroll costs.  (SBA Form 2483 (04/20)).[6]

The lending institution reviews the application and decides whether it meets the SBA requirements for funding.  Significantly, "lenders are subject to relatively few underwriting obligations before issuing loans . . . neither lenders nor SBA are conducting typical analysis of the characteristics of PPP applicants . . . ."  SBA, Interim Final Rule, 85 Fed. Reg. 38,303 (June 26, 2020).  Further, the CARES Act waives regular SBA fees, suspends the requirement that small businesses be unable to obtain credit elsewhere and waives any requirement for a personal guarantee or collateral for the covered loans.  *See* 15 U.S.C. §636(a)(36)(H), (I) and (J).

---

[6] This form has been amended on at least two occasions, the provisions referenced herein are also found in the most recent borrower application form, SBA Form 2483, revised June 24, 2020.

Upon approval, the applicant executes a PPP form of promissory note and funds are disbursed. The note itself expressly incorporates the PPP requirements and provides for the forgiveness. Here, the debtor executed, in favor of Truist Bank, a Paycheck Protection Program Promissory Note (the "PPP Note"). In the PPP Note, the debtor represents and warrants that "the loan evidenced by this Note is being made solely for the permitted use of proceeds specified by the CARES Act and related regulations, rules and guidance." Proof of Claim 1-1, Part 2, p. 3. The PPP Note further provides:

> Borrower acknowledges that (a) loan forgiveness will be provided by the SBA for the sum of documented payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities, and not more than 25% of the Forgivable Amount may be for on-payroll costs and (b) the forgiveness amount is subject to reduction based on employee headcount and compensation reductions during the 8-week loan period as compared to the prior periods in accordance with the CARES Act.

*Id*. at p. 2 (emphasis added). In the PPP Note:

> Borrower acknowledges and agrees that all proceeds of the Loan shall be used solely to fund the uses specified in the Paycheck Protection Program Rule ("Allowable Costs"); provided that, for the avoidance of doubt, in no event shall more than twenty-five percent (25%) of the total Allowable Costs paid by Borrower using proceeds of the Loan be attributable to non-payroll costs.

> At the conclusion of the Forgiveness Period, Borrower shall promptly but in no event more than thirty (30) days following the conclusion of the Forgiveness Period submit to Bank all documentation, accompanying certifications and other relevant disclosures required by the SBA under the CARES Act or otherwise requested by Bank on the worksheet provided by Bank for calculation of loan forgiveness amounts, a copy of which will be provided to Borrower after the date hereof.

*Id*. at p. 3. The PPP Note contains numerous provisions tying the obligation to the PPP rules and regulations. As examples:

> Borrower has read the statements included in the application related to this loan (the "Application") including the Statements Required by Law and Executive Orders, and Borrower understands them.

18

Borrower was and remains eligible to receive a loan under the rules in effect at the time the Application was submitted that have been issued by the Small Business Administration ("SBA") implementing the Paycheck Protection Program under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") (the "<u>Paycheck Protection Program Rule</u>").

All proceeds of the Loan will be used only for business-related purposes as specified in the Application and consistent with the Paycheck Protection Program Rule.

The current economic uncertainty makes the request for the Loan necessary to support the ongoing operations of Borrower.

All proceeds of the Loan will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule and Borrower acknowledges that if the funds are knowingly used for unauthorized purposes, the federal government may hold Borrower and/or Borrower's authorized representative legally liable, such as for charges of fraud.

Borrower has reviewed the SBA's affiliation rules and standards, including the application of such affiliation standards to eligibility requirements for the Paycheck Protection Program, and, after due and careful consideration, represents and warrants that Borrower satisfies all requirements for eligibility for the Paycheck Protection Program.

Borrower acknowledges that it has calculated the eligible Loan amount using the supporting documents which it has submitted to Bank. Borrower further acknowledges that execution of this Note constitutes Borrower's certification that it is in agreement with the Principal Amount of the Loan as set forth herein and that such Principal Amount is not in excess of the maximum principal amount permitted accordance with the CARES Act.

*Id*. at p. 1-2.

The nature of the debtor's obligation to repay the PPP loan must be determined by reference to the PPP Note, as amplified by the CARES Act itself, the SBA Rules, and the PPP application. Section 1106 of the CARES Act provides for forgiveness of up to the full principal amount of PPP qualifying loans. This is the essential purpose of the PPP. The SBA confirms this essential purpose in unequivocal terms:

19

SBA will forgive loans if all employee retention criteria are met, and the funds are
used for eligible expenses.

U.S. Small Business Administration, Paycheck Protection Program,

https://www.sba.gov/funding-programs/loans/coronavirus-relief-options/paycheck-protection-
program (last visited Aug. 13, 2020)).

The PPP application establishes at the very inception of the borrower's involvement the
nature of the financial accommodation which the applicant seeks: a loan for which "forgiveness
*will be provided* for the sum of documented payroll costs, covered mortgage interest payments,
covered rent payments, and covered utilities, and not more than 25% of the forgiven amount may
be for non-payroll costs."  SBA Form 2483 (04/20) (emphasis added).  In applying for PPP
funds, the applicant need not provide much, if any, financial information, or offer any collateral
or guaranty.

The PPP Note incorporates the SBA rules governing the PPP and obligates the borrower
to use the funds in accordance with the PPP.  More significantly, it also expressly provides that
"loan forgiveness *will be provided* by the SBA for the sum of documented payroll costs, covered
mortgage interest payments, covered rent payments, and covered utilities . . . ."  Proof of Claim
1-1, Part 2 at p.2 (emphasis added).

The foregoing establishes that forgiveness is the essential characteristic of the debtor's
obligation under the PPP Note and the PPP requirements.  But for forgiveness, there is no PPP.
Accordingly, as of the petition date, the debtor's liability to repay the PPP is dependent on it using
the funds for ineligible expenses or failing to meet employee retention criteria.  The debtor's liability
to repay the PPP "relies on some future extrinsic event which may never occur."  *In re Greene*,
574 B.R. at 577.  Additionally, it is subject to a "triggering event or occurrence . . . reasonably
contemplated by the debtor and creditor at the time" the debtor applied for and obtained the PPP

funds. *In re Barcal,* 213 B.R. at 1013. Therefore, the debtor's obligation was contingent as of the date of filing.

The court also concludes that the debtor's obligation under the PPP was unliquidated as of the petition date. The Bankruptcy Code does not define the term "liquidated." Again, borrowing from Chapter 13 cases, the concept of a liquidated debt relates to the amount of liability, not the existence of liability. *United States v. Verdunn*, 89 F.3d 799 (11th Cir. 1996). Courts generally hold that "the key factor in distinguishing liquidated from unliquidated claims is not the extent of the dispute nor the amount of evidence required to establish the claim, but whether the process for determining the claim is fixed, certain, or otherwise determined by a specific standard." *In re Barcal*, 213 B.R. at 1014. *See In re Adams*, 373 B.R. 116, 119-120 (B.A.P. 10th Cir. 2007) (a "debt is readily determinable only if the process of determining the claim is fixed, certain, or otherwise determinable by a specific standard"). *See In re Slack*, 187 F.3d at 1073 ("debt is liquidated for the purposes of calculating eligibility for relief under §109(e) if the amount of the debt is readily determinable."); *In re Stern*, 266 B.R. 322 (quoting and adopting *In re Barcal*, 213 B.R. at 1014, to determine that debts were fixed amounts due pursuant to a contract).

As explained above, the debtor will have no obligation to repay the PPP funds if all employee retention criteria are met, and the funds are used for eligible expenses. As of the petition date, the debtor had certified it intended to meet the employee retention criteria and use the funds for eligible expenses. Further, early in the case, the court entered an order requiring the debtor to do so. ECF 37. In connection with this dispute, the debtor submitted a declaration stating that, in fact, it has used all of the loan proceeds in accordance with the PPP requirements and will seek forgiveness of the entire loan balance in accordance with the PPP requirements. ECF 198.

21

The PPP obligation was not liquidated as of the petition date because it was not then known, and could not be determined, whether the debtor would use the PPP funds for ineligible expenses or would fail to maintain employee staffing levels in accordance with the PPP. Thus, it could not be determined what amount, if any, of the PPP funds the debtor would be obligated to repay.

Further, the loss of forgiveness is not an all or nothing proposition. Where a borrower fails to meet the SBA rules and CARES Act regulations, the borrower may still be granted forgiveness for the portion of the loan used in compliance with the rules and regulations. The extent to which a borrower will be obligated to repay the PPP loan depends on the amount of PPP funds it uses for ineligible purposes and the extent of its failure to maintain staffing levels. In these events, the amount of the loan forgiveness is based on amounts spent by borrower on payroll costs including taxes, insurance, salary, wages, and tips;[7] owner compensation replacement; and non-payroll costs including interest payments on business mortgage of real or personal property;

---

[7] For example, payroll costs are computed as follows (with additional exceptions not substantively relevant hereto): Under 1106(d)(5) of the CARES Act, at least 75% of the loan forgiveness amount must be for payroll costs. This amount was reduced to 60% in section 3(b) of the Flexibility Act. 15 U.S.C. §9005(d)(8). Payroll costs include salary, wages, commissions or similar compensation, including salary, wages or commissions to furloughed employees. 15 U.S.C. §9005(a)(8). For loans disbursed before June 5, 2020 and for borrowers electing to use an 8-week "covered period" (a defined term in the CARES Act) covered payroll costs for owner-employees and self-employed individuals is capped at 8 weeks' worth of 2019 compensation or $15,385 per individual, whichever is less. For loans eligible for or electing a 24-week "covered period," covered payroll costs are capped at 2.5 months' worth of 2019 compensation or $20,833 per individual, whichever is less. SBA, Interim Final Rule 85 Fed. Reg. 38,304 (June 26, 2020).

If borrower reduces its full-time equivalent employees during the "covered period," loan forgiveness is reduced by the same percentage as the percentage reduction in full-time equivalent employees. 15 U.S.C. §9005(d)(2). The term full-time equivalent employee is not defined in the CARES Act, the Administrator has defined the term as any employee who works 40 hours or more, on average, each week. A borrower's loan forgiveness will also be reduced if borrower has reduced an employee's salary or wages in excess of 25%. 15 U.S.C. §9005(d)(3). In general, forgiveness is reduced by the total dollar amount of the salary or wage reductions that are in excess of 25% of base salary or wages, subject to exceptions for borrowers who restore reduced wages or salaries.

payment on business rent obligations of real or personal property; business utility payments for electric, gas, water, transportation, telephone or internet.[8]

Again, as of the petition date, it could not be determined the extent to which the debtor might use the PPP funds for ineligible expenses or might fail to maintain employee staffing levels.  It turns out the debtor complied with these requirements and anticipates complete forgiveness.  *See* ECF 198.  But considering the question as of the petition date, there was no way to determine what amount, if any, the debtor might be obligated to repay.  Therefore, the debtor's obligation under the PPP was unliquidated as of the date of the filing, and is excluded from the debt limitation determination under §1182.

### Conclusion

For the foregoing reasons, the court concludes the lease rejection claims and PPP obligation were contingent as of the date of filing, and the debtor's obligation to repay the PPP was unliquidated as of that date.  Therefore, these claims are not included in the debt limitation determination of §1182 and the debtor is eligible to proceed under Subchapter V.

cc:
Parking Management, Inc.
1725 DeSales St. NW
Washington, DC 20036
Debtor

Michael J. Lichtenstein

---

[8] The complexity of the PPP lies within the many interim rules adopted to implement the CARES Act, addressing the employee retention criteria, eligible costs and expenses, and other matters that can result in the recipient's obligation to repay the loan if all employee retention criteria are not met, and the funds are not used for eligible expenses.  The SBA has published, as of the date of this opinion, at least twenty-four interim final rules, covering everything from affiliation, eligibility, promissory notes, seasonal employers, lender requirements, loan increases, cooperatives, loan forgiveness and lender/borrower responsibilities—just to name a few.  All interim final rules are published in the Federal Register and are most easily accessed on the U.S. Department of Treasury website: https://home.treasury.gov/policy-issues/cares/assistance-for-small-businesses.

Shulman Rogers Gandal Pordy & Ecker, PA
12505 Park Potomac Avenue, 6th Floor
Potomac, MD 20854
Debtor's Counsel

Monique D. Almy
1001 Pennsylvania Ave, N.W
10th Fl
Washington, DC 20004
Trustee

Lynn A. Kohen
U.S. Trustee Office
6305 Ivy Lane, Suite 600
Greenbelt, MD 20770
U.S. Trustee

Mary J. Dowd
Arent Fox LLP
1717 K St. NW
Washington, DC 20006
Attorney for JBGS

Walter R. Kirkman
Baker Donelson
100 Light ST. 19th Fl
Baltimore, MD 21202
Attorney for Truist Bank

Gwynne L. Booth
Greenstein Delorme & Luchs, P.C.
1620 L St. NW Ste. 900
Washington, DC 20036
Attorney for Connecticut/DeSales, LLC

Catherine Harrington
Bregman, Berbert, Shwartz, Gilday, LLC
7315 Wisconsin Ave. Ste. 800
Bethesda, MD 20814
Attorney for Union Investment Real Estate

**END OF MEMORANDUM**